| | | |
|---|---|---|
| DILLON B. REEDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16-cv-02164-SEB-TAB |
| | ) | |
| DOUGLAS G. CARTER, in his official | ) | |
| capacity as Superintendent of the Indiana | ) | |
| State Police, | ) | |
| | | |
| Defendant. | | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before us on Cross-Motions for Summary Judgment filed by

Plaintiff Dillon B. Reeder ("Mr. Reeder") [Dkt. No. 40] and by Defendant Douglas G.

Carter, Superintendent of the Indiana State Police ("ISP") ("Superintendent Carter") in

his official capacity [Dkt. No. 37]. The motions relate to Mr. Reeder's claims under the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and are

ripe for ruling. For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for

Summary Judgment and <u>DENY</u> the Motion for Summary Judgment filed by Plaintiff.

## **<u>Factual and Procedural Background</u>**

The ISP Recruit Academy located in Plainfield, Indiana conducts an annual,

limited duration program to train recruits who aspire to become State Troopers. Mr.

Reeder, as part of his effort to become a State Trooper, enrolled in ISP's 74th class,

which ran from July 21, 2014 to December 23, 2014. Deposition of Zachary Parker, Dkt.

No. 37-1 ("Parker Dep.") at 2.

Academy curriculum consists of 929 hours of required training, which includes physical training and classroom-based training in criminal justice, administrative, and police-related subjects. Deposition of Superintendent Carter, Dkt. Nos. 37-2 and 44 ("Carter Dep.") at 99; Deposition of Sargent Russell Garrison, Dkt. Nos. 37-4 and 44 ("Garrison Dep.") Ex. 3. The ISP regards the physical training component as "not something that [one] can simply observe"; rather, active participation is required. *Id.* In that vein, the ISP retains authority to dismiss from the Academy recruits who fail to satisfy the minimum physical standards set forth by the Indiana Law Enforcement Training Academy ("ILEA").[1] Carter Dep. at 90; Garrison Dep. Ex. 3. Certain aspects of Academy training require recruits to wear Tactical Defense Uniforms ("TDUs") comprised of a duty belt and a bulletproof vest. Garrison Dep. Ex. 11.

The essential skills required of a State Trooper trainee are set forth by statute and by the 74th Recruit Academy Policy and Procedures Manual. Garrison Dep. Ex. 11. A recruit must complete rigorous physical training and pass substantive coursework selected by the Superintendent. Ind. Code § 10-11-2-14(b); *see also* 240 IAC 1-44-4 and 5 (providing that ISP requires that recruits "conform to the physical standards prescribed by the Superintendent and the State Police Board," specifying that recruits must "be able to successfully pass any physical agility tests as may be prescribed by the department.").

---

[1] ILEA certification is awarded to Indiana's cadre of law enforcement officers who successfully complete the training program by the Indiana Law Enforcement Training Board, which is not a party to this lawsuit. Ind. Code § 5-2-1 *et seq.* ISP Academy training is recognized for purposes of obtaining ILEA certification. Garrison Dep. Ex. 9.

On weekdays during the training sessions recruits remain on Academy grounds with permission to leave only when released by their instructors. The ISP contracts with a third party provider to supply recruits with all meals, and the menus reflect a limited choice of options. Deposition of Major Charles Sorrells, Dkt. Nos. 37-2 and 44 ("Sorrells Dep.") at 39.

Superintendent Carter is vested with sole authority to determine recruits' eligibility to graduate from the Academy. Carter Dep. at 101. Upon successful completion of the ISP Academy course, recruits are eligible to apply for State Trooper positions located in various Indiana counties. Recruits are also required to participate in post-graduation training under the instruction of a Field Training Officer ("FTO"). Garrison Dep. at 105. The duration of this final stage of training is fourteen weeks, which allows a recruit to obtain capstone training and experience from a veteran trooper. Sorrells Dep. at 117.

**Plaintiff's Attendance at the Academy**

Mr. Reeder enrolled in and began attending the ISP Academy in July 2014. Within a few months, during his fifteenth and sixteenth weeks, he began experiencing significant back pain. Deposition of Dillon Reeder, Dkt. No. 37-3 and 44 ("Reeder Dep.") at 26, 28, 30. A few weeks following the onset of his back pain during the Academy's eighteenth week, he sought medical treatment on November 7, 2014 at Indiana University Hospital in Martinsville, Indiana, and was diagnosed with having uncontrolled Type 1 diabetes. Dr. Thomas Lahr, M.D. admitted him to St. Francis Hospital to undergo glucose reduction and insulin treatment in an effort to stabilize his condition. As a result, he

missed four days of classroom-based training offered that week. Reeder Dep. at 24. Mr. Reeder testified that at the time of his diagnosis he had lost over fifty pounds from the first day he enrolled in the Academy. Reeder Dep. at 28.

According to Mr. Reeder, Major Sorrells, the Academy's Human Resources officer, visited him at Indiana University Hospital in Martinsville on November 9, 2014, and again at St. Francis Hospital on November 10 and 12, 2014. Reeder Dep. at 29-30. Mr. Reeder testified that Major Sorrells informed him that a recording was being made of the classroom sessions during his hospitalization which would allow him to catch up with the missed presentations upon his return. *Id*. at 32.

Prior to his release from St. Francis Hospital on November 10, 2014, Mr. Reeder's physician provided him with guidelines and recommendations for meals and warned him against engaging in strenuous exercise which could negatively affect his blood sugar levels. Reeder Dep. at 38. Mr. Reeder was advised to request that the Academy make available to him an appropriate meal plan. *Id*. Mr. Reeder testified that Major Sorrells was present during this discussion with the discharging physician. *Id*. at 39.

Mr. Reeder maintains that Major Sorrells informed him that he had satisfied most of the requirements for becoming a State Trooper, needing only at that point to "log classroom hours" following his return to the Academy. *Id*. He recalls that Major Sorrells promised to arrange for an appropriate meal plan for him at the Academy and to assist him in securing a post-graduation job in the county closest to Mr. Reeder's hometown to allow him to continue his medical appointments. *Id*. at 33. Major Sorrells, however, denies having had any specific discussions with Mr. Reeder regarding accommodations

following his return to the Academy. Sorrells Dep. at 115-16. In any event, the ISP stresses that only the Superintendent, not Major Sorrells or anyone else, has the authority to determine whether and when a recruit has satisfied the Academy's graduation requirements. Carter Dep. at 101.

On November 16, 2014, one day prior to Mr. Reeder's return to the Academy, Gary Midla, D.O., Mr. Reeder's family physician, cleared Mr. Reeder to return to the classroom but issued a written report to the ISP notifying ISP that Mr. Reeder was "not yet able to tolerate the rigors of the physical part of his training." Garrison Dep. Ex. 9. When Mr. Reeder returned to the Academy on November 17, 2014, he did so with the expectation that he would receive any and all required accommodations necessitated by his medical condition. Reeder Dep. at 96, 136.

Mr. Reeder asserts that for the most part his dietary needs were not met; only on a handful of occasions during the first few days after his return to the Academy were his meals properly adjusted. Reeder Dep. at 41-43, 61. The ISP explains that it did its best to accommodate Mr. Reeder's dietary needs, given its contractual relationship with the third party food service provider. Defendant's Answers to Plaintiff's Interrogatories, Dkt. 37-7 ("Defendant's Answers") at 3. During mealtimes, Mr. Reeder reported that he personally assumed responsibility for his meals by limiting his intake to foods lower in carbohydrates and substituting other fare with specially made turkey sandwiches. Reeder Dep. at 36, 38-39. On his first day back at the Academy, the ISP permitted Mr. Reeder to access snacks between meals, which had been delivered by his mother. ISP also allowed Mr. Reeder unrestricted access to refrigerated beverages. Defendant's Answers at 2.

Mr. Reeder sought to be excused from his physical training courses (Reeder Dep. at 96) but his instructors were unable to accommodate this request. He engaged as much as he could, even while wearing his TDU. Reeder Dep. at 39. However, Mr. Reeder found this activity to be too rigorous for him. Reeder Dep. at 45. On November 21, 2014, Dr. Lahr, Mr. Reeder's family physician, sent a letter to the ISP similar to the one provided by Dr. Midla advising that Mr. Reeder still "should not be involved in any physical activity." Garrison Dep. Ex. 10. This letter was received and read by Major Sorrells. Sorrells Dep. at 32. Nonetheless, Mr. Reeder was required to continue strenuous training, which produced episodes of significant exhaustion for him. Reeder Dep. at 60.

There is no dispute between the parties regarding the fact that any required accommodations to training procedures by the Academy are made on a case-by-case basis. Sorrells Dep. at 94. However, there is a dispute as to whether recruits were on occasion permitted to observe, as opposed to directly participate in, a training activity, a practice Mr. Reeder refers to as "red-tagging." Reeder Dep. at 39. Mr. Reeder maintains that the practice of "red-tagging" occurred from time to time, though ISP staff apparently remained unaware of its use. Sorrells Dep. at 110-11. To make this point, Mr. Reeder identified certain other recruits who had suffered injuries and were excused from physical training for short periods of time (*i.e*., one week). In such cases, the recruits were given a "red tag" to show they were under restrictions until they were physically able to return to training.[2] Reeder Dep. at 61-62. One recruit who had suffered a broken shoulder and was

[2] Mr. Reeder identified these other recruits who allegedly were "reg-tagged" for, for example, a knee injury (recruit Glaze) or a spider bite (recruit Henson). They were each

excused from training during the final two or three weeks of Academy training was still permitted to graduate subject to his completion of the missed training. Garrison Dep. at 43; Defendant's Supplemental Answers, Dkt. No. 44 at 106.

The ISP made various accommodations for Mr. Reeder following his diabetes diagnosis. He was allowed to carry equipment with him for monitoring his blood sugar levels and to notify his instructors if he needed modifications of the physical training. He was allowed to return to his dorm to rest as needed, at his discretion. Defendant's Answers at 3. On certain occasions, he was excused altogether from engaging in training exercises when he was unable to complete them. He was also excused from Evasive Vehicle Operations ("EVO") training on an occasion when he did not feel well (Reeder Dep. at 49). Another time, Mr. Reeder was escorted back to his dorm without having completed an exercise called "night fire."[3] Reeder Dep. at 53-55. Once, his instructor exempted him from an exercise called "one on one hitman" since he had previously completed "two on one hitman." *Id*. at 47.

---

excused from physical training for approximately one week. Reeder Dep. at 45. Glaze was permitted to reschedule the defensive tactics training he had missed, and ISP reschedule the Evasive Vehicle Operations ("EVO") training for recruit Posey. Defendant's Supplemental Answers to Plaintiff's Interrogatories, Dkt. No. 44 ("Defendant's Supplemental Answers") at 106. Another recruit in Mr. Reeder's class allegedly sustained a knee injury and was excused from training for two or three weeks. Parker Dep. at 22.

[3] Mr. Reeder testified that his instructors had told him that EVO and "night fire" were not graduation requirements. Reeder Dep. at 53-55, 60.

At some point, it became clear that Mr. Reeder would be unable to complete all the requirements necessary in order to graduate as a member of the 74th Academy. This determination was reflected in ISP records. Carter Dep. at 101. In December 2014, prior to the recruits' participation in the Quickening Field Scenarios, a  strenuous, three-day off-site training exercise in Jennings County referred to as "the Quickening," Mr. Reeder was deemed unqualified to participate. Carter Dep. at 102-03, 122.

### Mr. Reeder's Fitness-for-Duty Report and Removal from the Academy

Prior to the Quickening, Mr. Reeder was ordered by the ISP to undergo a Fitness-for-Duty evaluation, which examination and report were completed by Dr. Steven Moffatt, M.D. on December 9, 2014.[4] Reeder Dep. at 63. This evaluation was to

_____

[4] In his briefing, Mr. Reeder relies on the deposition testimony of Dr. Moffatt, whose services the ISP solicited in conjunction with Mr. Reeder's fitness-for-duty opinion. Deposition of Dr. Steven Moffatt, Dkt. No. 44 at 4-15 ("Moffatt Dep."); Dkt. No. 41 Plaintiff's Brief in Support of Summary Judgment, Dkt. No. 41 ("Pl.'s Br.") at 16-19. Dr. Moffatt, Medical Director of Public Safety Medical in Indianapolis, Indiana, is a practicing physician who sees patients and provides consultation for municipalities and agencies throughout Indiana. Moffatt Dep. at 7. Mr. Reeder deposed Dr. Moffatt, whom Mr. Reeder identified as an expert witness, on August 29, 2017. The ISP argues that Dr. Moffat is actually a fact witness because his testimony concerns his interactions with and observations of Mr. Reeder gleaned in the course of treating him. Defendant's Response Brief, Dkt. No. 45 ("Def.'s Resp.") at 3. According to the amended Case Management Plan, depositions of fact witnesses and testimony concerning issues of liability were to have been finalized by August 14, 2017. *See* Dkt. No. 31; Moffatt Dep. at 4-5. Because Dr. Moffatt's deposition was taken after the deadline for fact witnesses set by the amended Case Management Plan for fact witnesses, the ISP moves to exclude Dr. Moffatt's testimony. *See* Dkt. No. 31; Moffatt Dep. at 4-5; Def.'s Resp. at 3 (citing *Cripe v. Henkle Corp.*, 858 F.3d 1110, 1112 (7th Cir. 2017) ("Attaching the report of a fact witness, such as a treating physician, to an expert's report does not turn the fact witness into an expert witness.")). Dr. Moffatt's deposition was taken fifteen days after the deadline and thus violated schedule set out in the the Case Management Plan. We regard this as a technical violation:  the period of delay was not substantial, no prejudice has

determine whether Mr. Reeder's medical condition might prevent him from performing the essential functions of a State Trooper position. Moffatt Dep. at 10. Based on the examination, the evaluations by Doctors Midla and Lahr, Dr. Moffatt prepared the following report:

> Dillion Reeder is a 23 year old Trooper cadet currently in the Academy who presented with substantial weight loss in November 2014 of approximately 42 pounds during the Academy. He was noted to have severe exhaustion and was taken to the emergency room and found to have a blood sugar of over 1200. . . He was hospitalized for 4 days undergoing glucose reduction and the institution of insulin to control his diabetes Type 1.

> Additionally, while hospitalized he was found to have renal insufficiency secondary to his diabetes crisis . . . His renal functions have returned to their normal measurements without any significant proteinuria. He has done well with regard to monitoring his blood sugars every 2 hours and providing those to his endocrinologist, Dr. Waddle, who has provided him adjustments in his insulin. He is additionally on a sliding scale regular insulin adjustment. He has no other complications associated with his diabetes.

> Mr. Reeder understands that this disease is his responsibility with regard to his treatment and that he is to be compliant with regard to his insulin dosage. It is also anticipated that in the near term approximately 4-8 weeks he will undergo an insulin pump placement for greater, more accurate control of his diabetes with an anticipation to be released to unrestricted activity. However at this point in time due to his continued episodes of exhaustion, it is recommended that he not be placed in any strenuous physical activity until further insulin adjustment is provided regulating his glucose.

> It should also be mentioned that the potential for death due to his initial diagnosis of diabetes with a blood sugar of over 1200 was a significant potential at presentation; however he at this point in time has returned back to normal functioning.

---

flowed from it and there is no evidence of intentionality or bad faith on the part of Mr. Reeder. Dr. Moffatt's deposition testimony may remain as part of the record.

. . . .

In conclusion, Dillon is status post new diagnosis of Type 1 insulin diabetes currently being regulated with insulin and is anticipated to have an insulin pump within the next 4-8 weeks. He has done well with regard to compliance and has undergone nutrition counseling. Prognosis is reasonably good for a return to unrestricted activity in approximately 4-8 weeks after implementation of the insulin pump. It should be noted that I should review his medical condition prior to return to unrestricted duty as a Trooper in approximately 4-8 weeks.

Carter Dep. Ex. 9. Superintendent Carter received this report on December 10, 2014.

On that same day, December 10, 2014, Mr. Reeder was summoned to Superintendent Carter's office (Carter Dep. at 108) where he was informed by Superintendent Carter as follows: "I regret to inform you that you will not graduate with your class. We realize that you are just too sick to continue." Reeder Dep. at 67. Although Superintendent Carter testified that he thought highly of Mr. Reeder, he believed that Mr. Reeder posed a risk of harm to himself. Carter Dep. at 76, 84, 104 (Reeder was "exactly the kind of guy [the ISP] would want"), 105 (Mr. Reeder had "a tremendous amount of character" and "a tremendous amount of drive"). Superintendent Carter's judgment was based on "the totality of over 20 weeks of training" and the total picture of [Mr. Reeder's training status]" (*i.e.*, he had not been able to fully participate in training). Superintendent Carter told Mr. Reeder that he did not think Reeder could perform the Quickening exercise nor did he believe that due to the restrictions on Mr. Reeder's physical activity throughout the remaining duration of the Academy, any accommodation(s) could have been made that would allow Mr. Reeder to continue on as a recruit to a successful completion of the program. *Id.* at 102, 105, 123.

Mr. Reeder insisted to Superintendent Carter that he believed he could complete the Quickening and begged to be allowed to finish, offering to "sign anything saying if anything happens to [him], it's [Reeder's] fault." Reeder Dep. at 68. Superintendent Carter responded that he thought it unwise and could not bear to have "on his conscience" some worse problems befalling Mr. Reeder. *Id*. As a result, Superintendent Carter felt compelled to order the removal of Mr. Reeder from the Academy. Carter Dep. at 102.

Mr. Reeder understood that if he refused to resign from the Academy, he would be terminated (Reeder Dep. at 68), which is exactly what happened: Mr. Reeder refused to resign and was removed from the 74th ISP Academy on December 10, 2014.

**Defendant's Offer of an Alternative Post and a Position in the 75th Academy**

Following Mr. Reeder's departure from the Academy, the ISP offered to employ him as a dispatcher, which offer Mr. Reeder declined. Reeder Dep. at 76-77. Thereafter, the ISP offered to hold a spot for Mr. Reeder in the Academy the following year, in the 75th Academy. Reeder Dep. at 76-77. Mr. Reeder initially accepted this offer, apparently after having spoken with Major Sorrells who recommended that Mr. Reeder focus on getting healthy and return to the 75th Academy class. Reeder Dep. at 75-77. Though Mr. Reeder satisfied all the entry requirements for the 75th Academy class and did not believe he would require any restrictions on his physical activity in order to participate (*id*. at 77-78), he did believe that he would require a special dietary plan (*id*. at 106), and ISP made those arrangements. Deposition of Troy Torrence, Dkt. No. 37-6 ("Torrence Dep.") at 2. On the date of his check-in when Mr. Reeder arrived at the Academy, he inquired about

the possibility of his taking a "refresher course" in lieu of repeating the Academy curriculum. The ISP informed him that such a "refresher course" was not an available option.

At some point Mr. Reeder apparently learned that Major Sorrells once referred to him as an "unlucky cocksucker." Garrison Dep. at 104-06. Major Sorrells denies making this comment. Sorrells Dep. at 29. Additionally, Mr. Reeder reports that he learned that Major Sorrells and others had expressed concerns that, if he became a State Trooper, the ISP would have "somebody else on the department that they were paying for the next 25 years that couldn't do the job." Garrison Dep. at 85. This was an uncomplimentary reference to a former recruit and current ISP employee, Rex Caldwell. [5] *Id.* at 86. Whether anyone with the ISP admits to actually making this statement, we have not been told. This prompted Mr. Reeder to notify Major Sorrells later that day that he no longer wished to attend the Academy. Reeder Dep. at 79, 86, 88.

**This Litigation**

Mr. Reeder filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the ISP on September 11, 2015. On August 12, 2016, after receiving a right to sue notice from the EEOC, Mr. Reeder filed his Complaint (Dkt. No. 1) in this court against Superintendent Carter in his official capacity, which complaint he amended on November 21, 2016. Dkt. No. 14. The Amended

---

[5] Rex Caldwell was a State Trooper trainee who was diagnosed with a brain tumor while enrolled in the Academy; he was unable to work as a Trooper but was given a job in the quartermaster charged with distributing ISP gear. Garrison Dep. at 86.

Complaint alleges that the ISP violated the ADA by terminating Mr. Reeder's employment relationship and failing to accommodate his disability. *Id*. at 1, 13-16. Mr. Reeder requests that the court: (1) order the ISP to employ and reinstate him as an Indiana State Trooper and provide him with seniority equal to all other troopers in the 74th ISP Academy class, including crediting him with all training and education he had completed as of the time of his termination; (2) order the ISP to certify Mr. Reeder as a law enforcement officer and reinstate him as an Indiana State Trooper without requiring him to return to the Academy to undergo further training; and (3) award him the costs of this action, including reasonable attorney's fees incurred in prosecuting this lawsuit. *Id*. at 17.

## Legal Analysis

### I.     Standards of Review

#### A. Summary Judgment

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Hoffman-Dombrowski v. Arlington Intern. Racecourse, Inc*., 254 F.3d 644, 650 (7th Cir. 2001). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to

the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Courts often confront cross-motions for summary judgment as have been filed here because Rules 56(a) and (b) allow both plaintiffs and defendants to move for such relief. In such situations, courts consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citing *Celotex,* 477 U.S. at 324). Accordingly, we have considered the parties' respective memoranda and the exhibits attached thereto, and have construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant. *Id.*

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

**B. ADA Claims**

Mr. Reeder's claims against the ISP arise under the ADA, 42 U.S.C. § 12101 *et seq.*, which safeguards disabled individuals against workplace discrimination and ensures access to public facilities, commercial establishments, and telecommunications services. In the area of employment, the ADA provides that no employer subject to the Act shall "discriminate against a *qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The statute further defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111(8).

To establish a *prima facie* claim under the ADA, a plaintiff must show that: "(1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation; and (3) he has suffered from an adverse employment decision because of his disability." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); *Dvorak v. Mostardi Platt Assoc.*, 289 F.3d 479, 483 (7th Cir. 2002). An employee may state a claim for discrimination under this portion of the ADA in one of two ways. *See Basith v. Cook County,* 241 F.3d 919, 926–927 (7th Cir. 2001). First, he can claim that he suffered disparate treatment—in other words, that the employer treated him differently *because of* his disability. *See Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021–1022 (7th Cir. 1997). Second, an employee

may claim that his employer violated the ADA by failing to provide a reasonable accommodation for his known disability. *Spurling,* 739 F.3d at 1061. This "failure to accommodate" cause of action derives from the statute's provision that the definition of discrimination includes: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A); *see also Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir. 1996). Mr. Reeder's disability-based discrimination claim must satisfy the pleading requirements enunciated by the Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (holding that the "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's (age) caused the discharge or other adverse employment action.'").

## II. Plaintiff's Legal Claims

As a threshold matter, to the extent there are factual disputes underlying the pending motions, we hold that they are not material to our analysis of any of the issues raised here. The parties have varying versions of certain conversations that allegedly occurred during Mr. Reeder's participation in the ISP's 74th Academy, but what is not disputed between them is that due to his physical limitations related to his diabetes Mr. Reeder was unable to fulfill his training obligation prior to the conclusion of the Academy session. Nor is it disputed that the ISP offered him two separate forms of employment-related accommodations, both of which Mr. Reeder rejected. The minor

factual differences are not material and do not foreclose summary judgment. See

*Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (explaining that a

disputed fact is material only if it could affect the outcome of the lawsuit).

Mr. Reeder advances two specific claims under the ADA, both against

Superintendent Carter in his official capacity.[6] According to Mr. Reeder, the ISP failed to

provide a reasonable accommodation for the effects of his Type I insulin-dependent

diabetes while he was attending the 74th ISP Academy (Pl.'s Br. at 22-30); and it

discriminated against him when it terminated him from his position as a recruit and State

Trooper trainee following his diagnosis. Pl.'s Br. at 30-33. We address these issues and

counterarguments in turn below.

### A. Failure-to-accommodate Claim

In order to prevail on a "failure to accommodate" claim under the ADA, a plaintiff

must set forth evidence establishing that: "(1) he is a qualified individual with a

disability; (2) the employer was aware of his disability; and (3) the employer failed to

reasonably accommodate the disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d

789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir.

2001)); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015). Here, the

---

[6] A suit against a governing official in his official capacity is, of course, treated as a suit against the entity by which the official is employed, *Kentucky v. Graham*, 473 U.S. 159, 163 (1985), which in this case is the ISP. State officials may not be personally sued for violations of the ADA. *Walker v. Snyder*, 213 F.3d 344, 347 (7th Cir. 2000).

ISP does not dispute that Mr. Reeder's Type 1 diabetes constitutes a "disability" within the meaning of the ADA.[7] Def.'s Br. at 6, n.1.

Neither does the ISP dispute that it was aware of Mr. Reeder's diabetes at the time it removed him from participation in the Academy classes without making a specific effort to accommodate his disability so that he could continue. Thus, remaining for decision are two issues: whether Mr. Reeder was a *qualified* individual with a disability when he was enrolled in the Academy, and, if so, whether the ISP failed to reasonably accommodate his disability.

The protections of the ADA extend only to "qualified individuals" with a disability. *Basith*, 241 F.3d at 927. A plaintiff is qualified under the ADA if he is able to perform the essential functions of his position with or without a reasonable accommodation. 42 U.S.C. § 12111(8).

In determining whether a plaintiff is a "qualified individual," we first consider the prerequisites of the specific employment position and then turn to whether the individual can perform the essential functions of that position with or without a reasonable accommodation. *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 285 (7th Cir. 2015). Prerequisites typically include factors such as an appropriate educational background or certain levels of experience and skills. *Id.* at 285. Unless evidence reveals that such

_____

[7] The ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12102 (Supp. 2009), broadened the definition of disability and overturned the Supreme Court's decisions in *Sutton v. United Airlines,* 527 U.S. 471 (1999), and other related cases. The 2008 Amendments are not germane to this case given that neither party contends that Plaintiff is not disabled.

factors are ignored in practice, we grant substantial deference to an employer's statement of its own job requirements. *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998) ("Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job.") (citations omitted).

A plaintiff bears the burden of showing that he can perform the essential functions of his job with or without reasonable accommodation. *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits,* 601 F.3d 674, 680 (7th Cir. 2010). With respect to the existence of reasonable accommodations, a plaintiff need only make the initial showing "that an 'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 762 (7th Cir. 2012) (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 398 (2002)). The burden then shifts to the defendant to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," rendering the proposed accommodation unreasonable in fact. *Barnett,* 535 U.S. at 402; *E.E.O.C. v. United Airlines,* 693 F.3d at 762.

With this framework in mind, we turn to determine whether a reasonable jury could conclude on the basis of the uncontroverted facts before us that Mr. Reeder was capable of performing the essential functions of an Indiana State Trooper trainee with or without any accommodation for his diabetic condition. The ISP says he was not. Mr. Reeder says he was.

The purpose and goal of the Academy is to train recruits to serve in law enforcement positions including in the Indiana State Police. Indiana State Troopers are required to perform physically demanding, even rigorous tasks in connection with the prevention and detection of criminal activity. Trooper trainees must also show a capacity to perform tasks involving the same level of rigor as a full-fledged Trooper. Recruits are required to complete a course of study and training selected by the ISP Superintendent. These requirements are consistent with similar standards recognized and approved by the Seventh Circuit in other cases. *See Rodrigo v. Carle Foundation Hosptial*, 879 F.3d 236, 242 (7th Cir. 2018) (hospital was entitled to require resident to pass an exam that was a prerequisite for obtaining a license to practice medicine); *Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998) (fire department was entitled to require paramedic certification for a fire-fighter job), and an employee who failed to obtain certification within the allotted time was not a "qualified individual" for ADA purposes).

Mr. Reeder's Type 1 diabetes presented during the final weeks of the 74th Academy training session. Ultimately, despite treatment, his diabetes impeded his ability to complete the required training in the following categories:  Firearms, Emergency Vehicle Operations, Defensive Tactics, Physical Training, Quickening Field Scenarios, Spanish for Law Enforcement, Burglary, ARIDE, Field Command, Field Training Program, Crash Investigations, Writing Police Reports, Situational Awareness; Mechanics of Arrest, and Point Control. Garrison Dep.at Ex. 3.

Mr. Reeder contends that despite his failure to accomplish the required training in these areas, he was able to perform all of the essential functions of a State Trooper trainee

in accordance with the assessments of certain ISP instructors and officials, other than Superintendent Carter. He argues that having successfully passed all Academy courses and conformed to ISP's physical standard for a successful trainee, he was eligible for graduation. Plaintiff's Response Brief, Dkt. No. 46 ("Pl.'s Resp.") at 17, 22. Mr. Reeder cites the statements and experiences of other recruits to the effect that that certain elements of the training which he admittedly did not complete were not required as prerequisites for graduation. *Id*. at 17-18, 22, 24-28. Mr. Reeder maintains that if further training were required in order for him to graduate, the ISP had a duty to undertake reasonable accommodations, such as a tailored meal plan appropriate for a diabetic, the suspension of strenuous physical training, and the installation of an insulin pump. These steps, he maintains, would have allowed him to finish the course at the Academy.

The ISP rejoins that the uncontroverted evidence makes clear that Mr. Reeder was not a qualified individual entitled to ADA protections, that no reasonable accommodation would have permitted him to continue as part of the 74th Academy class and complete the program, and that the two employment-related options ISP offered to him to continue his relationship with the ISP were reasonable accommodations, which in both circumstances he chose to reject. Def.'s Resp. at 11-16; Defendant's Reply Br., Dkt. No. 50 at 1-7.

Our review of the record discloses no evidence to support a finding that Mr. Reeder was a qualified individual within the meaning of the ADA. He was permitted by his physicians to return to the Academy following his release from the hospital, but it soon became readily apparent that he was "not able to tolerate the rigors of the physical part of his training" (Pl.'s Resp. at 5), with or without accommodations. Following Mr. Reeder's

21

return to the Academy, ISP was advised that Mr. Reeder's doctor's restriction on physical activity must extend through the remainder of the Academy training term and, though his prognosis was "reasonably good," meaning he would likely respond to appropriate treatment and behavior modifications, there was no guarantee that he would ever be able to return to unrestricted activity (Carter Dep. Ex. 9). Mr. Reeder concedes this fact. Pl.'s Br. at 26.

Moreover, Mr. Reeder fully admits that he failed to complete the entirety of the educational program necessary to become a State Trooper. Mr. Reeder, relying on Major Sorrells' and Commander Garrison's opinions, maintains that he had demonstrated sufficient physical proficiency to graduate. These opinions do not carry the day here, because, as all agree, only the Superintendent has the authority to determine whether and when a recruit had or would be able to satisfy the Academy's standards and graduation requirements, and he did not share the view of Sorrells and Garrison with regard to Mr. Reeder's eligibility to graduate. Carter Dep. at 101; Garrison Dep. at 50-51 (explaining that he (Garrison) did not have the authority to waive training for individual recruits); Sorrells Dep. at 8 (explaining that he (Sorrells), who works in Human Resources, does not oversee Academy training matters).

The ISP asserts that it was unaware of any accommodation that would have allowed Mr. Reeder to continue to train and complete the course during the 74th Academy, given the seriousness of his condition that was newly-diagnosed at the time. Defendant's Brief in Support of Summary Judgment, Dkt. No. 38 at 9; Def.'s Resp. at 15. In fact, Mr. Reeder has been unable to demonstrate that any reasonable accommodation would have enabled

him to perform the essential functions of a State Trooper trainee. He points to his encouraging, positive discussions with Major Sorrells during his hospitalization (Pl.'s Resp. at 20), but complains that the ISP shirked its obligation under the ADA when, upon his return to the Academy, it "immediately breached its agreement of accommodation by refusing to provide the appropriate diabetic meals and continued to require Reeder to strenuously train." *Id*. at 26. It is not clear that proving "appropriate diabetic meals" would have been enough to overcome his physical limitations relating to exertion levels. Nor is it clear that the dietary adjustments that were made were inadequate.

The ISP persuasively argues that Major Sorrells and Academy instructors were attempting in good faith to find workable accommodations to deal with Mr. Reeder's restrictions from all strenuous physical activity. As Major Sorrells explained, Mr. Reeder's restrictions from strenuous physical activity was for "a period of time to see if he was going to heal or not, sufficiently, to continue on." Sorrells Dep. at 66. The ISP's efforts to work with Mr. Reeder to accommodate his physical restrictions prior to determining that no accommodation proved workable did not foreclose or preempt a final decision by Superintendent Carter or otherwise undermine the legitimacy of its final conclusion that Mr. Reeder was not a qualified individual under the ADA. *Sieberns*, 125 F.3d at 1023 ("[e]mployers should not be discouraged from doing more than the ADA requires even if the extra effort that perhaps raises an applicant's expectations does not work out."); *see also Vande Zande v. State of Wis. Dept. of Admin*, 44 F.3d 538, 545 (7th Cir. 1995) ("And if the employer…bends over backwards to accommodate a disabled worker—goes further

than the law requires— . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.").

The ISP was entitled to reject as unreasonable Mr. Reeder's request for restrictions on strenuous physical activity through the end of the Academy while still allowing him to graduate, which would have been the equivalent of an exemption from his training requirements. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 799 (7th Cir. 1996) ("An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."). To the extent Mr. Reeder's request for a diet that was appropriate for a diabetic and that would have allowed him to complete the Academy would have been a reasonable accommodation but was withheld from him, the ISP's actions do not demonstrate such a failure. In fact, the evidence discloses dietary modifications for an initial period of time after Mr. Reeder's return to the Academy. Thereafter, Mr. Reeder apparently was able to self-regulate his diet on his own by arranging to receive turkey sandwiches from the food service providers, snacks as he personally arranged for, and unlimited access to supplies of water. Dr. Moffatt's or Dr. Lahr's opinions that the provision of such a diet would likely ameliorate Mr. Reeder's circumstances in the short term did not address the restrictions they recommended on his strenuous physical activity for long enough to allow his body begin to recover and his systems normalize.

Mr. Reeder's request that the ISP provide him with an insulin pump was also not a reasonable accommodation. Had Mr. Reeder arranged for the installation of an insulin pump, the procedure apparently would have required a waiting period of several weeks,

which time would have extended past the Academy term. Any demand by him that the ISP either acquire this medical device for him or wait until it could be installed before he returned to the Academy and could graduate from that program was not a reasonable request for accommodation.

We conclude that the ISP met its obligations under the ADA to engage with Mr. Reeder in an attempt to identify and implement a reasonable accommodation. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d at 797. Under the ADA, an employee begins the accommodation "process" by informing his employer of his disability; at that point, an employer's "liability is triggered for failure to provide accommodations." *Spurling*, 739 F.3d at 1060 (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998)). Once an employer's responsibility to provide a reasonable accommodation is triggered, the employer must engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances. *Id.* (quoting *E.E.O.C. v. Sears, Roebuck,* 417 F.3d at 797). This "interactive process" occurred here.

An employer can satisfy its accommodation obligation by "reassign[ing] a disabled employee to a different position." *Gile*, 95 F.3d at 799. Following Mr. Reeder's removal from the Academy's 74th class due to his inability to complete the required training, ISP offered Mr. Reeder a desk job as a civilian dispatcher and, when Mr. Reeder rejected the offer, the ISP offered Mr. Reeder a position in the Academy class scheduled to commence the following year. Though Mr. Reeder initially accepted the ISP's offer to participate in the 75th Academy class, he ultimately rejected that as well. Significantly, Mr. Reeder indicates that he did not believe he needed any physical accommodations for the 75th

Academy, though he did request dietary accommodations, which ISP agreed to do. Torrence Dep. at 2.

The ISP describes both offers extended to Mr. Reeder as reasonable accommodations:  the dispatch position was consistent with Mr. Reeder's immediate restriction on strenuous physical activity and allowed him to remain within ISP's employ (this is noteworthy because the Academy sessions extended over only a limited period of time annually). Similarly, his inclusion in the 75th Academy was also a reasonable accommodation because it allowed Mr. Reeder another opportunity to become an Indiana State Trooper, following his recovery from the physical activity restriction. These options remained on the table until Mr. Reeder rejected them. *Gile*, 312 F.3d at 374.

Mr. Reeder views these options as unreasonable. Pl.'s Resp. at 31. The dispatcher job was neither a "transfer" nor a "reassignment" as required by the ADA because it is a civilian position, rather than a law enforcement position. Inclusion in the ensuing year's Academy was not a reasonable accommodation because the course would not begin until six months later, following his departure. *Id*. Mr. Reeder's decision not to engage further in the interactive process does not leave the ISP liable under the ADA. *Gile*, 312 F.3d at 374 (holding that if an employer "takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate. . .").  Mr. Reeder's refusals of the ISP's reasonable accommodations defeat his claim for relief on this basis.

### B.    Discriminatory Removal Claim

Mr. Reeder asserts as a secondary claim that his removal from the 74th Academy class amounted to disability-based discrimination. In order to prove a case of

discrimination under the ADA, a plaintiff must show the following elements: that he suffers from a disability as defined by law; that he is qualified to perform the essential functions of the job in question, with or without a reasonable accommodation; that he has suffered an adverse employment action as a result of his disability; and that similarly situated employees without a disability were treated more favorably. *Jackson v. City of Chicago,* 414 F.3d 806, 810 (7th Cir. 2005). If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the termination. *Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). If the employer succeeds with that showing, the plaintiff must then present evidence demonstrating that the employer's nondiscriminatory reason is pretextual. *Id.*

The ISP does not dispute that Mr. Reeder suffered an adverse employment action when it removed him from the 74th Academy class, but it contends that Mr. Reeder had not and would not have been able to meet the ISP's legitimate employment expectations because he was unable to complete the requisite training within the time frame of the 74th Academy course. Def.'s Resp. at 16. Even if Mr. Reeder were able to establish that he was a qualified individual, which claim we have rejected, *supra*, his discrimination claim would fail for lack of any comparators who are factually similar to Mr. Reeder.

Mr. Reeder represents that ISP "has consistently made significant accommodations" for other recruits who fell ill or who were injured in a way that precluded participation in physical activity. Pl.'s Resp. at 27. He points to circumstances of some of those recruits with whom he became familiar in his class at the Academy. According to Mr. Reeder, "ISP

had the ability and the capacity" to make physical training–related accommodations as shown with other recruits, and its failure to do so in his case was an act of discrimination. *Id*. at 26-29. Mr. Reeder cites the "red-tagging" procedure as proof that other recruits who fell ill or became injured were accommodated in that way, but the ISP refused to do so in his case. *Id*. at 32. In contrast to others, he was not permitted to reschedule his physically strenuous training, even after presenting a doctor's note restricting such activity. *Id*. at 31-32. Some recruits, such as Katayama of the 73rd Academy, who had missed training due to an orthopedic injury, was allowed to return to the Academy after graduation to complete the training, says Mr. Reeder. *Id*. at 32.

"A similarly situated employee must be directly comparable to [Mr. Reeder] in all material respects, which is a common-sense, flexible analysis of relevant factors." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Majors v. General Elec. Co.*, 714 F.3d 527, 738 (7th Cir. 2013)). Mr. Reeder has failed to identify any other recruit who had received a total physical restriction from all strenuous physical activity beginning several weeks prior to graduation and was still permitted to graduate from the Academy. The four individuals identified by Mr. Reeder who had experienced discrete, time-limited injuries do not satisfy the "similarly situated" element. The other injured recruits identified by Mr. Reeder who had missed training—in every instance but one, the absence was no more than one week—were allowed to later complete their course requirements while the Academy was still in session. Mr. Reeder's physical activity restriction prevented him from being able to complete his training prior to the end of the 74th Academy.

Mr. Reeder's allegation that Major Sorrells "disparaged [him] and referred to him using profane language" (Pl.'s Resp. at 33) thus evidencing an intent to discriminate against him on Mr. Reeder's diabetic condition is hard to understand. The offending language consisted of a single comment, a comparison of Mr. Reeder to a then-current ISP employee who had become incapacitated while a recruit at the Academy. The statement, which was made more than a week after Mr. Reeder had left the Academy, does not constitute evidence of disability discrimination against him; remarks of such a limited and temporally remote nature are clearly unavailing as relevant evidence. *See Basith, 241 F.3d at 926* (a party is required to "supply evidence sufficient to allow a jury to render a verdict in [his] favor."); s*ee also Jasmantas v. Subaru-Isuzu Automotive, Inc.*, 139 F.3d 1155, 1157 (7th Cir. 1998). Accordingly, summary judgment on Mr. Reeder's discrimination claim is also warranted.

## Conclusion

For all the foregoing reasons, summary judgment shall be entered in favor of the ISP on all of Mr. Reeder's claims. Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's Motion is DENIED. Final Judgment shall enter accordingly.[8]

IT IS SO ORDERED.

Date:     9/21/2018

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[8] Having denied Mr. Reeder's Motion for Summary Judgment, we need not address his requested remedies, injunctive relief in the form of reinstatement and/or front pay, based on the alleged violations of the ADA.

**Distribution:**

Benjamin M. L. Jones
Office of the Indiana Attorney General
Benjamin.Jones@atg.in.gov

Michael E. Morken
mmorken@hotmail.com